# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10200-NMG

|  |  |
|---|---|
| **ROBERT K. WATSON** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **Vs.** | ) |
|  | ) |
| **NORTHERN STATES INSURANCE** | ) |
| **AGENCY, INC., DRISICOLL PEARCE,** | ) |
| **INC., and ARTHUR P. PEARCE, III** | ) |
|  | ) |
| **Defendants** | ) |
|  | ) |
|  | ) |

## DEFENDANTS' OBJECTION TO PLAINTIFF'S MOTION FOR REMAND OF IMPROPERLY REMOVED CASE AND FOR JUST COSTS AND EXPENCES, INCLUDING ATTORNEY'S FEES, INCURRED DUE TO THE IMPROPER REMOVAL

### Defendant Objects To Plaintiff's Request For Oral Argument

Arthur P. Pearce, individually and as president of Northern States Insurance Agency, Inc. (Northern States) and as former president of Driscoll Pearce, Inc., the defendants herein, objects to the *Plaintiff's Motion For Remand Of Improperly Case And Just Costs And Expenses, Including Attorney Fees, Incurred Due To The Improper Removal* and *Oral Argument Requested.* The premise of the defendants' objection is based on the belief that the Honorable Court possesses the wisdom and intelligence necessary to make a decision based on the written record submitted by the parties and to conduct oral arguments as requested by the plaintiff would be a waste of precious court resources. Moreover, the plaintiff seeks an order awarding just costs and expenses, including attorney's fees,

1

incurred as a result of defendants alleged improper removal of this case *See* page 1

Plaintiff's Motion For Remand (Plaintiff's Motion). Granting the plaintiff's request for

oral arguments in light of the record now presented to the court would only serve to

unnecessarily enlarge the costs and expense already endured by the Honorable Court, the

plaintiff and the defendants.[1]  In addition, the defendants should prevail because complete

diversity does exist in this matter and the defendants' notice to remove was filed timely.

The Defendants move for an order of this Court directing:

> (1) The case not be remanded because its removal is proper be under 28 U.S.C.S.
>
>     §1441(b) and §1446(b). and
>
> (2) That the plaintiff's motion for his just cost and expenses, including attorney's
>
>     fees, incurred as a result of an alleged improper removal of this case be denied;
>
>     and
>
> (3) The plaintiff's request for oral argument be denied; and
>
> (4) Grant other such relief justice may require.

## FACTUAL BACKGROUND

Northern States is a successor entity to Driscoll Pearce, Inc. Northern States was

established in 1998 when Driscoll Pearce was sold to another entity not affiliated with

either Northern States or Driscoll Pearce, Inc. Driscoll Pearce, Inc. no longer exists.

Since its inception Northern States has not and does not conduct any business in

Massachusetts. It does not have any employees, does not solicit any business, and does

---

[1] Defendants' counsel contacted plaintiff's counsel via telephone on March 12, 2005 and explained to him that the February 8, 2005 letter he refers to in his motion was never received and although the defendants disagreed with the plaintiff's position in his motion, the defendants would agree to remanding it back to state court if the plaintiff would agree to withdraw its motion now pending before this court. The plaintiff declined to enter into this agreement. In light of the defendants' offer the plaintiff's continued insistence pressing forward with his motion is vexatious, oppressive and undertaken in bad faith and the court should consider sanctioning him.

not maintain any bank accounts, office space or telephone accounts. It does not even have a Massachusetts mailing address. Northern States' sole contact with Massachusetts is its entity succession accomplished by the name change that occurred on November 2, 1998 which was precipitated by the sale of Driscoll Pearce. All activities associated with the function of Northern States occur in New Hampshire. Its only physical location is in New Hampshire. Its only mailing address is in New Hampshire *See defendants exhibit No. 1.* All of its corporate officers and stock holders are located in New Hampshire. Its bank accounts are in New Hampshire.

In fact, **all written correspondence initiated by plaintiff Watson and directed to Defendants Arthur P. Pearce, III, Driscoll Pearce, Inc. and Northern States prior to this litigation were mailed by Watson to Pearce in New Hampshire** (emphasis added) *See defendants' exhibit No. 2 page one of a letter from plaintiff Watson dated March 11, 2004.* All phone calls relative to this matter pre-litigation were made by Watson to the defendant Arthur P. Pearce, III at his New Hampshire phone number.

Arthur P. Pearce, III is and has been a longtime resident of New Hampshire. He formally maintained a condominium located at 303 Centre Lane, Walpole, Massachusetts which he commonly used three nights a week when in Massachusetts attending to business prior to the sale of Driscoll Pearce nearly seven years ago. Pearce sold the condominium more than five years ago and still resides at the New Hampshire home he has maintained for more than eighteen years. The mailing address of that home is SR 62 Box 572, Center Harbor, New Hampshire 03226. The same address used by plaintiff Watson more than a year ago in his March 11, 2004 letter to the defendants. Id. It is also the address provided to the plaintiff's law firm and counsel to forward documents when the firm withdrew

from maintaining possession of Mr. Pearce's Last Will and Testament well prior to the beginning of this litigation.

## AURGUMENT

### I.    REMOVAL OF THIS ACTION IS PROPER.

#### A. This Court Does Have Jurisdiction Over This Action

The defendants maintain that jurisdiction to hear this matter rests with this Honorable Court for the reasons originally stated in its *Notice Of Removal And Petition To Remove*. Diversity of citizenship does exist between the parties and the amount in controversy exceeds $75,000.00. *SEE Notice Of Removal And Petition To Remove* which are now herein incorporated by reference. The plaintiff also argues that only defendant Arthur Pearce, III has requested removal and defendants Northern States and Driscoll Pearce have not joined the removal. However, plaintiff must be the only one confused as to who joined the removal. SEE plaintiff's Exhibit no. 5. You will see that the honorable court understands what plaintiff does not, Christopher M. Tremblay has appeared as lead counsel for all of the defendants.  Plaintiff's argument to the contrary is specious and trivial.

The defendants argue that the test of citizenship for purposes of determining diversity are not unlike the test for determining personal jurisdiction because at its root is whether or not a party is a citizen of a particular jurisdiction for litigation purposes.

It is well settled that courts have retreated from formalistic constrictions of stringent physical presence in favor of a more flexible substantive approach in determining jurisdiction. Quill Corporation v. North Dakota by and Through Heitkamp 504 U.S. 298, at 308 (1992). (Citing International Shoe v. State of Washington 326 U.S. 310 (1945)).

The defendant entities here, Northern States and Driscoll Pearce, Inc. are legal fictions. Therefore, unlike an individual their "presence" within and without a given state can be manifested only by activities carried on in their behalf by those who are authorized to act for it. International Shoe v. State of Washington 326 U.S. 310, at 317 (1945). The Shoe inquiry looked for continuous and systematic contacts as well as the quality and nature of the activities engaged in by the corporation. Id at 320. The analysis not rooted in one singular act, Id, at 319.

During the time in question International Shoe maintained a sales force in the state of Washington, solicited orders, filled orders in the state and rented hotel rooms for sales purposes over a number of consecutive years. These continuous and systematic contacts ultimately satisfied the court's inquiry as to the quality and nature of the corporation's activities in the state of Washington to deem that the fictional entity had a "presence" in the state.

Here the plaintiff points to one singular act of Northern States and Driscoll Pearce which occurred nearly seven years ago to establish their "presence" within the Commonwealth of Massachusetts, the November 1998 name change filing *SEE Plaintiff's Exhibit No. 1.* By the plaintiff's own admission Northern States has ceased doing business, in Massachusetts. *SEE plaintiff's Complaint at No. page 2 No. 14.* The defendants expand on this fact by stating that Northern States never did business in Massachusetts. The plaintiff also fails to indicate with any specificity as to exactly what transaction on what date or dates give rise to this lawsuit.

The plaintiff points to the Civil Cover Sheet as evidence of the residence of the corporate entities here. The defendants' counsel would like to claim clerical error to explain the

information. But candor requires a deeper explanation. The Civil Cover Sheet doesn't have a "not really" box to check off regarding citizenship of the principal parties. Unartfully the defendant mistakenly punted when filling out that section of the coversheet. In retrospect, the facts indicated supra and infra dictate that the correct response should have been none of the defendants resides in Massachusetts.

Driscoll Pearce, Inc. no longer exists so it must be said that its citizenship is diverse from the plaintiff's. Its citizenship does not exist in Massachusetts or anywhere else. The plaintiff himself alleges that Northern States ceased to do business in the Commonwealth of Massachusetts and fails even to allege when, where, why and how he ever did business with Northern States.

It is evident that Northern States is "present" only in New Hampshire. The defendants admit that perhaps the clerical mechanism of winding up the corporate contacts in the Commonwealth of Massachusetts is seven years behind but, as the plaintiff says, the fact of the matter is Northern States has ceased doing business there. To be more accurate Northern States has never done business in Massachusetts.

Northern States corporate officers and stockholders are in New Hampshire. Its mailing address is in New Hampshire as evidenced by the plaintiff's own March 11, 2004 letter. *See defendants exhibit No 2.* The plaintiff even called Arthur P. Pearce, III in New Hampshire to discuss the issues alleged in this litigation.

Because the plaintiff admits that Northern States ceased to do business in Massachusetts, because the plaintiff himself has directed all written and telephone correspondence regarding this matter prior to litigation to Arthur P. Pearce in New Hampshire, because the plaintiff's own admissions and acts supports the defendants' position that Northern

States exists only in New Hampshire. The Honorable Court should apply the flexible

substantive test described in <u>Shoe</u> and determine that Northern States is a citizen of New

Hampshire and not the stringent mechanical test rejected by <u>Shoe</u> that the plaintiff would

likely prefer. The court should not look only at the single act committed by Northern

States in Massachusetts, the name change filed nearly seven years ago. It must look at the

substantive acts of Northern States and the plaintiff's own admissions and declare

Northern States a citizen of New Hampshire for purposes of finding complete diversity in

this matter.

### B. <u>Removal Is Proper Under 28 U.S.C. S. §1446</u>

The plaintiff makes much of the requirement that a petition to remove must be filed

within thirty day **after the receipt by the defendant...**of the initial pleadings...

(Emphasis added). His rational is that all three defendants received notice of the

plaintiff's complaint on the same day. He buttresses these arguments with plaintiff's

exhibit No.4 supplementing his motion. Pages two and four of the plaintiff's Exhibit No.

4 are supposed to demonstrate the receipt of service by all named defendants via certified

mail on December 10, 2004. However, none of the return receipts, including the one

addressed to Arthur P. Pearce, III bears the signature of Arthur P. Pearce, III.

Massachusetts Rules Of Civil Procedure, Rule 4 (e) regarding service by mail of an out of

state defendant requires a signed receipt. Presumably the receipt should be signed by the

defendant in spirit at least. The plaintiff has not presented any such evidence. Further

examination of the evidence indicates that the plaintiff mailed the summons to an address

in Florida, not New Hampshire where the defendants reside. Only because the Florida

post office forwarded the mail to New Hampshire did any of the defendants receive

notice of this proceeding. Its odd how the plaintiff could hunt down the defendants in Florida but he couldn't send notice directly to the defendants at their residential address, an address well known to the plaintiff and his counsel. The plaintiff gives no explanation for this convoluted method of notifying the defendants.

Its true defendant Arthur P. Pearce, III spends an appreciable amount of time in Florida. The plaintiff must be aware of this as evidenced by the address where the plaintiff sent the summons originally. However, the summons was returned to the defendant's New Hampshire address because though he had been in Florida, he had returned to New Hampshire prior to receiving the summons from the plaintiff in Florida. Mr. Pearce receives an atypical amount of mail as compared to the average household. Thus when he returns from Florida after an extended stay he has a fair amount of mail to wade through as well as other matters to attend to upon his return. He did not pick up his mail from the post office when he returned. He did not sign for the plaintiff's summons. Even though the mail from the plaintiff was picked up on December 10, 2004 a day or two went by before Mr. Arthur P. Pearce, III "otherwise received" the plaintiff's summons. The plaintiff could have better ensured Mr. Pearce's receipt of the summons had he not only sent it certified return receipt but also restricted delivery to Mr. Pearce personally at his residence in New Hampshire. Doing so would have required Arthur P. Pearce, III to personally sign for the plaintiff's summons and presumably accomplish the intended spirit of Massachusetts Rules Of Civil Procedure, Rule 4 (e) regarding service by mail of an out of state defendant. Mr. Pearce otherwise received service on December 11 or 12, 2004 when he personally came into possession of the certified mail. If Mr. Pearce received it on December 11, 2005 then, arguably the notice to remove was perhaps a day

late. However, if it was December12, 2004 then, Mr. Pearce made it within the

proscribed 30 days.

Whether Mr. Pearce otherwise received the plaintiff's summons on December 11 or 12,

2004, the court shouldn't punish Mr. Pearce given the convoluted manner the plaintiff

chose to notify the defendants. First the plaintiff sent the summons to Florida even

though it is well known by the plaintiff and his counsel that Mr. Pearce resides in New

Hampshire. Second, the plaintiff failed to ensure notice to Mr. Pearce by failing to restrict

delivery of the summons exclusively to Mr. Pearce. Rewarding the plaintiff for not

strictly adhering to the letter and spirit of Massachusetts Rules Of Civil Procedure, Rule 4

(e) but punishing Mr. Pearce for what is not a clear a violation of 28 U.S.C.S. §1446(b)

would be fundamentally prejudicial unreasonable and unfair to Mr. Pearce. The

plaintiff's own evidence fails to conclusively demonstrate that Mr. Pearce filed his Notice

Of Removal beyond the requirements of 28 U.S.C.S. §1446(b). However Mr. Pearce

does present a colorable argument that his petition was timely and states affirmatively he

believes it was.

## C. PLAINTIFF IS NOT ENTILTED TO HIS REASONABLE ATTORENY'S FEES AND COSTS BECAUSE THE REMOVAL OF THIS ACTION BY PEARCE AND THE DEFENDANTS' ATTORNEY IS NOT IMPROPER AND EVEN IF THE COURT DETERMINES IT WAS IT IS NOT SANCTIONABLE.

It is well settle in the United States Court Of Appeals For The First Circuit that the

court's power to sanction is not unbridled. United States Of America v. Zoraida

Figueroa-Arenas United States Court Of Appeals No. 01-2149 (2002) USCA1 OPINION

01-2149 HTTP://WWW.CA1.USCOURTS.GOV/CGI-BIN/GETOPN.PL?OPINION=01-

2149.01A (last viewed March 13, 2005). The defendants have attached a copy of the case

9

for the court's convenience *See defendants' exhibit No.3.* at page No. 6 of the exhibit, top of page. In fact, to do so would chill vigorous but legitimate advocacy. Id. The court however agrees that conduct that is vexatious, oppressive or undertaken in bad faith should be sanctioned. Id SEE page no. 5 of the defendants' exhibit 3 at the bottom of the page. The plaintiff's motion does not claim that the conduct of the defendants or their counsel is vexatious, oppressive or undertaken in bad faith. Instead he relies on insults referencing first year law students directed at counsel for the defendants.

In Figueroa-Arenas the court went on to say the absence of any factual misrepresentations and the presence of a colorable legal argument make it unlikely that sanctionable bad faith presents itself. Id at page no. 7 of defendants' exhibit No. 3 last paragraph.

The defendants have put forward colorable arguments against all of the plaintiff's arguments as to why this matter should be remanded. Many of the facts relied on by the defendants for their arguments have been provided by the plaintiff himself so the facts as stated have not been misrepresented by the defendants. Even if this Honorable Court finds flaws in the defendants' reasoning within their objection and even if the Honorable Court is able to distinguish the cases the defendants rely on herein, such a finding still would not rise to a sanctionable level absent a finding of conduct that is vexatious, oppressive or undertaken in bad faith. Id. See defendants' exhibit No. 3 at pages 7-8 bottom of pg. 7 and top of pg. 8.

It is also well settled that one must come before the court with "clean hands" when it seeks favorable treatment from the court. If the moving party lacks clean hands the court is within its discretion to deny the relief sought by the moving party or at least reduce it

by some measure that reflects the moving party's bad conduct. Religious Technology

Center v. Dell Liebreich In Re The Estate Of Lisa McPherson  The United States Court

Of Appeals For The Fifth Circuit No. 03-41447, 03-41447.0 WPD

FTP://OPINIONS.CA5.USCOURTS.GOV/BYDATE/JUN2004/JUN03.41447.0.WPDF

(last visited March 13, 2005). For the convenience of the court a copy of this case is

provided. *See* defendants' Exhibit No. 4 at page 17 last paragraph.

First, the plaintiff complains that the defendants failed to file their notice to remove prior

to the 30 day deadline proscribed by 28 U.S.C.S. §1446(b). The plaintiff and his counsel

also say that they state in a "good-faith assertion that Arthur P. Pearce, III is a resident of

Massachusetts" *SEE* plaintiff's motion page 2 footnote No. 2.  Any first year law student

knows that it is a violation of the rules of professional conduct to knowingly make a

statement to the court which he knows to be false. No cite should be required, it's

axiomatic. Certainly a skilled and experienced attorney such as plaintiff's counsel

understands this.  The rule is just as axiomatic as applied to the presentation of false

evidence.  Now for the dirty little secret that the plaintiff's counsel doesn't want this

Honorable Court to know. Prior to this litigation the firm now representing the plaintiff

represented defendant Arthur P. Pearce, III when it maintained possession of Mr.

Pearce's last will and testament. When this firm no longer involved itself in the estate

matters of Mr. Pearce the attorney for the plaintiff did discuss where to send Mr. Pearce's

documents with both Mr. Pearce and his counsel. He was given Mr. Pearce's New

Hampshire address. It is the very same address used more than a year ago by the plaintiff

himself to correspond with defendant Pearce. *See defendants Exhibit No.2.*  Instead, the

plaintiff and his counsel cling to a nearly seven year old state filing *See plaintiff's Exhibit*

*No.* 1 and a website of no known authority purporting to show a Massachusetts phone number and address for Mr. Pearce (SEE Plaintiff's Exhibit No. 6) as a fig leaf to make a misrepresentation to the court regarding the residency of Mr. Pearce. Both the plaintiff and his counsel know or should have known that this statement to the court is at best a demonstration of their bad-faith and at worse a lack of complete candor to this honorable tribunal. It also shines further light on the plaintiff's convoluted method of providing notice to the defendant Mr. Pearce and adds credence to Mr. Pearce's argument that the plaintiff's suggested timeline is suspect regarding the 30 day deadline to file the notice to remove. Frankly such a blatant disregard for candor should cast a dark shadow over the plaintiff's entire argument for remand, costs and attorney fees.

## CONCLUSION

The plaintiff freely admits that Northern States ceases to do business in Massachusetts. The defendants agree with the plaintiff and expand on this fact to say that Northern States never did business in Massachusetts. It has operated entirely and exclusively in New Hampshire. The plaintiff and his counsel have corresponded with the defendants in writing at the defendants' address in New Hampshire well before the beginning of this litigation. The defendants' officers and stockholders all reside in New Hampshire. The plaintiff and his counsel know full well that all of the activities that speak to citizenship of the defendants such as their mailing address, and phone number and any other activities all take place in New Hampshire, the misrepresentations contained in the plaintiff's motion before the Honorable Court notwithstanding.

Despite knowing the defendants are domiciled in New Hampshire the plaintiff sent notification of this litigation to the state of Florida. He also failed to ensure notification of

defendant Arthur P. Pearce, III when he failed to require restricted delivery of the summons to Mr. Pearce and when he failed to require his signature on the return receipt in direct violation of the spirit of Massachusetts Rules Of Civil Procedure, Rule 4 (e) regarding service by mail of an out of state defendant requiring a signed receipt. To the degree that the plaintiff's preferred method of providing notice to Mr. Pearce and to the degree that it slowed Mr. Pearce in "otherwise receiving notification" and hence his response to this litigation, the plaintiff bares a large part of that burden. For the plaintiff to now split hairs over a day one way or the other is disingenuous at best in light of his actions in this matter. The submissions by each party provide a sufficient basis for the Honorable Court to render an informed decision on the plaintiff's motion to remand and the defendants' objection to it. Oral argument would only result in a waste of the tribunals resources and add unnecessary costs and expense for each party—an issue the plaintiff already complains of. The plaintiff motion should be denied in whole without oral argument.

## OBJECTION TO PLAINTIFF'S REQUEST FOR ORAL ARGUMENTS

The defendants find it to be an undue burden to travel more than 100 miles each way for the sake of an unnecessary oral argument. Particularly in light of the fact that plaintiff's counsel rejected defendants' offer to remand it back to state court if he would withdraw this motion. The submissions by each party provide a sufficient basis for the Honorable Court to render an informed decision on the plaintiff's motion to remand and the defendants' objection to it. Oral argument would only result in a waste of the tribunals resources and add unnecessary costs and expense for each party—an issue the plaintiff

already complains of. The plaintiff's motion should be denied in whole without oral

argument.

Respectfully submitted,
ARTHUR P. PEARCE,
individually and as president of
Northern States and Driscoll Pearce, Inc.
By their attorney,

Dated: March 14, 2004

Christopher M. Tremblay, Esq.
10 Wildemere Terrace
Concord, NH 03301
(603) 731 4330

14

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10200-NMG

| | |
|---|---|
| **ROBERT K. WATSON** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **Vs.** | ) |
| | ) |
| **NORTHERN STATES INSURANCE** | ) |
| **AGENCY, INC., DRISICOLL PEARCE,** | ) |
| **INC., and ARTHUR P. PEARCE, III** | ) |
| | ) |
| **Defendants** | ) |
| | ) |
| | ) |

## AFFIDAVIT OF CHRISTOPHER M. TREMBLAY

1. I am an attorney with an office located at 10 Wildemere Terrace Concord, NH 03301.

2. I and am a member in good standing of the New Hampshire Bar Association.

3. The facts I alleged within the defendants' foregoing Objection are based on my own personal knowledge, information and belief and I believe those facts to be true.

Signed under pains and penalties of perjury this the 15th day of March, 2005.

Christopher M. Tremblay

## CERTIFICATION OF SERVICE

I, Christopher M. Tremblay, hereby certify that I caused a true copy of the defendants' foregoing *Objection To Plaintiff's Motion For Remand Of Improperly Removed Case And Just Costs And Expenses, Including Attorney Fees, Incurred Due To The Improper Removal And Objection To Plaintiff's Request For Oral Argument* to be served upon Charles A. Cook, attorney for the plaintiff, by mailing a copy postage paid to 250 Summer Street, Boston, Massachusetts 02210.

March 15, 2005

Christopher M. Tremblay

*[Handwritten annotation pointing to sender area]:* Defendant's address and Phone number

**FedEx Express**

**US Airbill**

FedEx Tracking Number  **8492 4749 3900**

**1 From** Please print and press hard.

Date 1/10/05

Sender's FedEx Account Number

Sender's Name ARTHUR PEARCE   Phone ( 603 ) 253-8800

Company NORTHERN STATES

Address 319 WHITTIER HWY STE 3

City CENTER HARBOR   State NH   ZIP 03226-3624

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.

**3 To**
Recipient's Name Civil Clerk   Phone (617) 748-9152

Company United States District Court

Address 1 Courthouse Way

City Boston   State MA   ZIP 02210

1051-3857-1

**4a Express Package Service**
- [ ] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b Express Freight Service**
- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5 Packaging**
- [X] FedEx Envelope
- [ ] FedEx Pak
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling**
- [ ] SATURDAY Delivery
- [ ] HOLD Weekday
- [ ] HOLD Saturday
- [ ] No   [ ] Yes
- [ ] Yes
- [ ] Dry Ice
- [ ] Cargo Aircraft Only

**7 Payment** Bill to:
- [X] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

**Total Packages** 1   **Total Weight** 15   **Total Declared Value** $ .00

**8 Sign to Authorize Delivery Without a Signature**

Questions? Visit our Web site at fedex.com or call 1.800.Go.FedEx 1.800.463.3339.

0290439634

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO THE PAC

Robert K. Watson  ←—— *Plaintiff*
22 Brettwood Road
Belmont, MA  02478
(617) 484-8933

March 11, 2004  ←—— one year ago

Mr. Arthur P. Pearce III
SR 62, Box 572
Center Harbor, NH  03226

*Defendants'*
*Address*

RE: Driscoll Pearce Inc. and its successor
     Northern States Insurance Agency, Inc.

Dear Arthur,

As we agreed during our discussion, the following is written in an attempt to summarize the on going situation regarding the funds I believe you owe me. I realize that neither party wants to be committed to any particular figure at this point, but I feel that we both want to settle the matter by early April 2004.

Before proceeding, I should point out that the minimum dollar amount acceptable remains at $9,625.83. The actual total, however, is $12,033.45, consisting of $7,434.59, $947.90, and $3,650.96.

As you know, I wrote several letters to you beginning in 1999 after I had discovered the shortages. All were written in order to clarify the figures involved and to conclude this matter once and for all. In those communications I furnished you with a dollar summary.

The non-credited commission accounts total $7,434.59. These accounts were exclusively handled by the Driscoll-Pearce Personal Lines Department. This included the processing, the billing, and the letters, etc. This manner of handling continued to be implemented by NorthStar. The accounts were switched from my own to Direct account despite the fact that I was the listed producer on them (see attached). This certainly separates these particular items from any over or underpayment situations. In addition, no expiration lists were ever given to me.

There is also the question regarding the Bad Debts, which total $6,532.74. Of this amount, I can presently substantiate that at least $3,650.96 was never properly credited to my account. In addition, I can verify that I never was paid the $947.90 due on the Leathertone account.



# United States Court of Appeals

## For the First Circuit

———————————

No. 01-2149

UNTIED STATES OF AMERICA,

Appellee,

v.

ZORAIDA FIGUEROA-ARENAS,

Defendant.

———————————

ADALINA DE JESUS-MORALES,

Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]

------------------------------

Before

Torruella, Selya and Lipez,

Circuit Judges.

------------------------------

Judith Berkan, with whom Berkan/Mendez was on brief, for appellant.

Stella J. Song, Special Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Chief, Criminal Division, and Frank J. Bustamonte, Special Assistant United States Attorney, were on brief, for appellee.

May 6, 2002

**SELYA, Circuit Judge.** The efforts of a number of persons to halt the Navy's use of the island of Vieques for bombing and other live-fire exercises sometimes have gone beyond what the law permits. These excesses, and the federal courts' necessary involvement in bringing lawbreakers to account, have spawned considerable public controversy. This appeal stems from an incident related to that controversy. In it, the appellant, attorney Adalina De Jesús-Morales, asks us to annul sanctions imposed against her by the district court in the course of a Vieques protest case. As the recent history of appeals indicates, the district court has done an admirable job in handling a

sudden influx of several hundred protesters' cases under the
microscope of pervasive media attention; but in this unusual
instance, taking direct account of the need to assure robust advocacy
in criminal matters, we find no legally sufficient basis for the
imposition of sanctions (and, therefore, vacate the challenged
order).

The background facts are not disputed. The Navy has used Vieques for
live-fire exercises for upward of sixty years. Its activities have
become increasingly unpopular over that span (at least among some
groups) and protests have erupted from time to time. E.g., United
States v. Parrilla Bonilla, 648 F.2d 1373, 1374 (1st Cir. 1981). A
fatal accident (involving an employee of the Navy) occurred in 1999.
This accident drove the dissonance to a new pitch. As a result, the
federal district court has been deluged with criminal trespass cases
brought against protesters who were arrested after they entered
either the naval base situated on the island of Vieques or the areas
associated therewith. See, e.g., United States v. Ventura-Meléndez,
275 F.3d 9, 16-18 (1st Cir. 2001); United States v. Maxwell, 254 F.3d
21, 23-24 (1st Cir. 2001); United States v. Sharpton, 252 F.3d 536,
538-39 (1st Cir. 2001) (per curiam). This massive infusion of cases
has thronged the already congested docket of a busy court.

After the initial batch of arrests -- 465 in all -- the chief judge
of the district court acted quickly to marshal available judicial
resources. Although the court's standard praxis called for the random
assignment of criminal cases, [1] the chief judge entered an order
dated June 28, 2000 (the Presentment Order), which directed that all
Vieques cases be brought to the chief judge upon filing for
assignment by him to available district and magistrate judges in a
rotating sequence (the mechanics of which were not specified). The
Presentment Order bore only the chief judge's signature.

In April of 2001, another wave of protests occurred and an additional
181 criminal trespass cases were filed. The chief judge granted the
government's ex parte motion to consolidate and the cases were
segregated into clusters (by arresting officer). The consolidations
left some of the judges with multiple groups of defendants and others
with few or none. To alleviate this unequal distribution, the senior
active judge, temporarily at the court's helm in the chief judge's
absence, ordered groups of cases reassigned to equalize the judges'
workloads.

Although these arrangements proved more efficient in certain
respects, they created a number of anomalies. Some defendants found
themselves lumped with other defendants who had been arrested at
different times and/or places. When certain defendants complained
that they had not received prior notice of the government's motion to
consolidate, and that, at any rate, the consolidation order violated

the joinder provisions of Federal Rule of Criminal Procedure 8(b),
the chief judge rejected their importunings. He did, however, issue
an order explaining in some detail the rationale for the Presentment
Order, the consolidation order, and the ensuing reassignment of
groups of cases. See United States v. Ayala Ayala, No. 01-211 (D.P.R.
June 5, 2001) (unpublished order). He also explained that the terms
of the Presentment Order were no longer in vogue, but, rather, that
Vieques cases were being assigned randomly by the clerk's office, and
then reassigned by him only when necessary to ensure efficient
handling. See id.

The appellant represented a codefendant (Zoraida Figueroa-Arenas)
charged in the very case that yielded the June 5 order. She also
represented a second defendant (Juan Nuñez-Reynes) who had been
charged in another case arising out of the most recent spate of
protests. Both groups of cases had been shifted to the chief judge's
calendar by virtue of the consolidation order. On June 14, 2001, the
appellant (acting on behalf of both clients) moved to dismiss the
pending charges or, in the alternative, for reassignment. [2] Noting
that the statute authorizing district courts to promulgate local
rules, 28 U.S.C. § 137, requires that the chief judge respect these
rules and assign the cases as provided therein, the motion papers
asserted that an assignment system cannot deviate from that
established by the court's local rules without the consent of the
judicial council for the circuit in which the district sits. Because
the Presentment Order did not explain the source of the chief judge's
ostensible authority to contravene this statute, the motion argued
that the ad hoc assignment system for Vieques cases was fatally
flawed. The motion elaborated on this thesis, stating in part:

According to the Local Rules of this Court regarding the assignment
of cases, Rule 302.4 and Rule 302.8, civil and criminal case[s] must
be assigned by lot. The chief judge in this case has usurped the
authority of his fellow judges and taken control of the assignment
system for criminal cases. . . .


. . . .


. . . . The recent order of June 5, 2001 suggests that, contrary to
[the Presentment Order], Vieques trespass cases are being assigned
randomly by the clerk's office and then referred to the Chief Judge
for reassignment. Either way, the interference with the normal
practice of the Court regarding case[] assignments [is] unlawful and
must be voided as the Chief Judge does not have the authority to
alter this practice within the district.

The next day, the appellant appeared before the chief judge for a
scheduling conference in the Figueroa-Arenas matter. The conference
was held in chambers, with a court reporter present. The chief judge
expressed concern about the statements contained in the motion,
characterizing those statements as an unfair attack on the court.
Despite the appellant's disclaimer of any defamatory intent, the
chief judge placed her under oath to inquire into the factual
foundation for the statements. The appellant defended her handiwork
as a good-faith interpretation of the Presentment Order, the district
court's praxis, and the governing law. She admitted, however, that
she had done no independent investigation into the facts (i.e., that
she had not contacted the other judges in the district to ascertain
whether they had consented to the new system). [3] The chief judge
took no action at that moment.

Four days later, the chief judge denied the pending motion. United
States v. Figueroa-Arenas, 150 F. Supp. 2d 333, 335-36 (D.P.R. 2001).
He simultaneously denounced the allegations contained in the motion
as unfounded, declared that the appellant had failed to conduct a
suitable investigation before making those allegations, and worried
aloud that the allegations would lead "to the diminution of public
confidence in the Court as an impartial arbiter of the law,
especially when such false allegations find their way into the
media." Id. at 338. Concluding that the appellant's actions
constituted "misconduct" because she had made statements impugning
the integrity of a judge in reckless disregard of the truth, the
chief judge exercised the court's inherent power and ordered her to
pay a $500 fine. Id.

On July 6, 2001, Figueroa-Arenas was convicted on the underlying
charge. This timely appeal of the sanctions order ensued. In it, the
appellant argues that she did not have adequate notice of the
specific charges leveled against her; that the in-chambers colloquy
at the status conference did not constitute a meaningful opportunity
to be heard on the matter; and that, in all events, she did not
commit any sanctionable misconduct.

We review the imposition of sanctions for abuse of discretion.
McClane, Graf, Raulerson & Middleton, P.A. v. Rechberger, 280 F.3d
26, 42 (1st Cir. 2002); Jones v. Winnepesaukee Realty, 990 F.2d 1, 5
(1st Cir. 1993). It is common ground that if a trial judge is to
manage a crowded calendar fairly and efficiently, members of the bar
must comport themselves in a professional manner. When a lawyer goes
too far -- that is, when a lawyer's conduct is vexatious, oppressive,
or undertaken in bad faith -- the judge must be accorded considerable
latitude in dealing with such excesses. Whitney Bros. Co. v.
Sprafkin, 60 F.3d 8, 13 (1st Cir. 1995). Despite this imperative,

however, a judge's power to sanction an attorney is not unbridled --
and that power cannot be used to chill vigorous but legitimate
advocacy. See Kale v. Combined Ins. Co., 861 F.2d 746, 760 (1st Cir.
1988); In re Bithoney, 486 F.2d 319, 322 (1st Cir. 1973). In short,
sanctions are an integral part of the judicial armamentarium, but a
judge should resort to them only when reasonably necessary -- and
then with due circumspection. See Chambers v. NASCO, Inc., 501 U.S.
32, 44 (1991). We think it follows that, in an appeal from the
imposition of sanctions, substantial respect is owed to the trial
court's first-hand appraisal, but that respect "is not to be confused
with automatic acquiescence." United States v. One 1987 BMW 325, 985
F.2d 655, 657 (1st Cir. 1993).

In the ordinary case, the due process issues raised by the appellant
(which implicate notice and the opportunity to be heard) might form a
logical starting point for our analysis. Here, however, we find the
issue of whether the appellant committed any sanctionable misconduct
to be dispositive. Accordingly, we begin -- and end -- with that
issue.

Our decision in United States v. Cooper (In re Zalkind), 872 F.2d 1
(1st Cir. 1989), helps to set the stage. There, an attorney, reacting
to comments made by the trial judge, filed a recusal motion. Id. at
2. The judge took umbrage at the allegations contained in the motion
papers and eventually sanctioned the attorney for knowingly making
false accusations. Id. On appeal, we noted that a lawyer has a right
to file a recusal motion, even though it offends the judge or puts
him in an unflattering light, "when facts arise which suggest the
judge has exhibited bias or prejudice." Id. at 4. Finding that the
record contained an adequate factual predicate, and did not show
misrepresentation or bad faith on counsel's part, we vacated the
sanctions order. Id. at 4-5.

Even though the case at hand does not involve a recusal motion, the
principles that informed our decision in Cooper are fully applicable
here. The pivotal question is whether the record furnishes adequate
support for the chief judge's determination that the appellant acted
recklessly or in bad faith when she filed the motion to dismiss or
reassign. We think it does not.

On its face, the Presentment Order did not reflect that the chief
judge was acting with the approval of either the circuit council or
the affected judges. These omissions raised a reasonable doubt about
the chief judge's authority, acting alone, to exempt a particular
class of cases from the random lottery and to reassign those cases in
some other sequence. The appellant seized upon this doubt and wove a
colorable argument from it. She pointed out, correctly, that under
the district court's local rules and its standard praxis, assignment
of cases ordinarily is by lot; and cases, once assigned, usually
require the consent of both the transferor and transferee judges as a

precondition to any administrative reassignment. The appellant also noted, again correctly, that the enabling statute, 28 U.S.C. § 137, requires the chief judge to enforce the local rules as written (at least in the absence of leave from the circuit council to chart a different course). Given this factual and legal predicate, the appellant's characterization of the reassignment of her clients' cases as irregular was within the bounds of legitimate advocacy. So too her related argument that reassignment pursuant to the Presentment Order and the consolidation order was <u>ultra vires</u>.

This conclusion is reinforced by the inclusion, in the motion papers, of citations to a plenitude of decided cases. <u>E.g.</u>, <u>United States</u> v. <u>Pearson</u>, 203 F.3d 1243, 1255-67 (10th Cir. 2000); <u>Cruz</u> v. <u>Abbate</u>, 812 F.2d 571, 573 (9th Cir. 1987); <u>Utah-Idaho Sugar Co.</u> v. <u>Ritter</u>, 461 F.2d 1100, 1103-04 (10th Cir. 1972). These decisions gave the appellant's position a patina of plausibility. In <u>Utah-Idaho Sugar Company</u>, for example, the chief judge of the district court took for himself some cases that previously had been assigned to a judge assuming senior status. 461 F.2d at 1102. An affected party petitioned for mandamus, and the Tenth Circuit granted the writ. The court wrote:

[U]nder the terms of 28 U.S.C. § 137, it is unquestioned that the division of the court's business in a multi-judge district is the responsibility of the judges and not the responsibility of the chief judge acting unilaterally. The latter's duty is to insure that the agreed upon rules are enforced and are administered so as to carry out their purposes, but it is not his duty to promulgate rules without the approval of his fellow judges . . . .

<u>Id.</u> at 1103 (footnote omitted). The Tenth Circuit concluded that the chief judge could not unilaterally deviate from the district court's local rules "until such time as it clearly appears that he is acting with the full concurrence of the [appropriate authority]." <u>Id.</u> [4]

A lawyer should be allowed to argue that a case was wrongly assigned or transferred when circumstances give rise to a plausible assertion to that effect. Given the facts of record here, the absence of any factual misrepresentations, and the colorable legal argument advanced, we conclude that the appellant did not act in objective bad faith in filing the motion. <u>See</u> <u>Cooper</u>, 872 F.2d at 4 (suggesting that an attorney has a duty to file a motion that may help his client as long as the factual proffer supporting the motion is tendered "in good faith and [contains] no factual misrepresentations"); <u>In re Bithoney</u>, 486 F.2d at 322 (recognizing the need to allow "breathing room for the fullest possible exercise of the advocacy function"). Although the court below was free to point out the flaws in the

appellant's reasoning, distinguish the cases on which she relied, and ultimately deny the requested remedy, the motion nonetheless was an appropriate vehicle for advancing facially legitimate issues suggested by the record.

To the extent that the sanctions order can be read to accuse the appellant of acting in subjective bad faith, that accusation too lacks record support. Nothing in the wording of the motion or in the appellant's responses to the chief judge's questions indicates either that an improper motive inspired the filing or that she believed that what she had asserted was false. To cinch matters, the appellant came to this case with clean hands -- insofar as we can tell from the record, she had no prior history of contumacious conduct -- and the motion itself was couched in respectful (albeit fervent) language. While words such as "usurp" and "unlawful" might impugn a jurist's character in some contexts, the appellant appears to have used them only to argue that the court had overstepped the limits of its authority. In that sense, the motion was little more than a challenge to the chief judge's exercise of jurisdiction, and, as such, was appropriate.

The government has one last string to its bow. It attempts to justify sanctions based on the chief judge's finding that the appellant failed to conduct a proper investigation into the provenance of the Presentment Order. Assuming, for argument's sake, that the appellant had a duty to investigate the allegations set forth in the motion, cf. Fed. R. Civ. P. 11(b) (imposing such an obligation in the civil context), [5] we deem her investigation reasonable under the circumstances. She verified the contents of the Presentment Order, determined that it remained unrevoked, factored in the effect of the supplementary order issued by the senior active judge in the chief judge's absence, and considered the chief judge's explanatory order of June 5, 2001. To require more would be to place an undue burden on defense counsel in a criminal case. See In re Order to Show Cause, 741 F. Supp. 1379, 1383 (N.D. Cal. 1990) (noting that, when preparing motions in a criminal case, it is not defense counsel's responsibility "to perform the role of the court or the jury to decide ultimate truth"). We thus conclude that the appellant's conduct was within the permissible bounds of vigorous advocacy, and, therefore, that sanctions are unsustainable.

We have one final observation. The motion papers filed by the appellant do not accuse the chief judge of manipulation; they merely make the plausible (if ultimately unavailing) legal argument that he lacked the authority to take the steps that he took. To the contrary, the record is not only devoid of any suggestion that the chief judge used the assignment power for an invidious purpose, but, indeed, reveals that at all relevant times he was endeavoring to position the court to cope with an unanticipated deluge of cases that unexpectedly

had strained the institutional resources of the district court.

We need go no further. Because the appellant was guilty of nothing more sinister than the zealous discharge of her duty to represent her clients with vigor, we vacate the sanctions order.

.

**So Ordered.**

1. In terms, the operative local rule, D.P.R. R. 302.4, speaks only of civil cases. The parties agree, however, that the district court traditionally has applied this rule to criminal cases as well.

2. Although the motion did not elaborate on the prayer for alternative relief, the appellant presumably had in mind returning the cases to the judges who originally had drawn them.

3. The district court's local rules permit reassignment of cases in certain circumstances, e.g., if both the transferor and transferee judge assent to the reassignment. See D.P.R. R. 302.2, 302.7-302.9.

4. In 1972, when the Tenth Circuit decided Utah-Idaho Sugar Company, the judges of the district court, acting collectively, had the power to modify, rescind, or grant exceptions from the local rules. 461 F.2d at 1013. That power is now vested in the circuit council. See 28 U.S.C. § 332(d)(4).

5. We express some skepticism because there is no counterpart to Rule 11(b) in the criminal context. That is unlikely to be mere happenstance: "because of the significant liberty deprivation often at stake in a criminal prosecution, courts generally tolerate arguments on behalf of criminal defendants that would likely be met with sanctions if advanced in a civil proceeding." In re Becraft, 885 F.2d 547, 550 (9th Cir. 1989) (per curiam). As the Seventh Circuit perspicaciously observed, "novel arguments that may keep people out of jail ought not to be discouraged by the threat of [fines]." Wisconsin v. Glick, 782 F.2d 670, 673 (7th Cir. 1986).

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 10, 2004

Charles R. Fulbruge III
Clerk

REVISED

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 03-41447

---

RELIGIOUS TECHNOLOGY CENTER,

Plaintiff-Appellant,

versus

DELL LIEBREICH, as Personal Representative of the Estate of Lisa
McPherson,

Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
No. 03-41575

RELIGIOUS TECHNOLOGY CENTER,

Plaintiff-Appellee,

versus

DELL LIEBREICH, as Personal Representative of the Estate of Lisa
McPherson,

Defendant-Appellant.

---

Appeals from the United States District Court
for the Eastern District of Texas
(No. 00-CV-503)

---

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

PER CURIAM:*

This appeal is just the latest skirmish in the protracted war between these litigants. Consolidated before us are two appeals that are, in effect, cross-appeals by the combatants and their respective attorneys, each side seeking to shift attorney's fees and costs to the other in the form of sanctions. Indeed, that is the sole issue remaining in the instant appeal, the merits having long since been determined.

## I.   FACTS & PROCEEDINGS

This is the second time that the question of sanctions has been before us in this ongoing dispute between the Plaintiff-Appellant, Religious Technologies Center ("RTC") and the Defendant-Appellee, the estate of Lisa McPherson (the "Estate"). In the first appeal ("RTC I"), we vacated the entire judgment of the district court — including its award of sanctions in RTC's favor — for lack of personal jurisdiction over the Estate.[1] We heard RTC I after RTC prevailed in the merits trial of its breach of contract claim.

In addition to the compensatory damages awarded to RTC by the jury, the district court had awarded RTC attorney's fees totaling $327,654 and costs of $10,675 pursuant to the fee-shifting

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] See Religious Tech. Ctr. v. Liebreich, 339 F.3d 369, 376 (5th Cir. 2003), cert. denied, 124 S. Ct. 1085 (2004).

provision of the underlying contract.  In ruling on cross-motions for sanctions, the district court found that counsel for the Estate, Thomas and Kennan Dandar (the "Dandars"), had violated 28 U.S.C. § 1927 and ordered them personally to pay $98,296, being 30 percent of the total attorney's fees awarded to RTC.  The district court declined to sanction RTC's counsel.[2]

In RTC I, we did not address the merits of the Dandars' challenge to the district court's award of sanctions, because the issue of personal jurisdiction was dispositive.[3]  In responding to a motion to clarify, however, we explained that "the sanctions award is vacated and not reversed.  The vactur of the sanctions award is appropriate in light of our determination that there is no jurisdiction against the Estate of Lisa McPherson.  The district court can reconsider the sanction issue in light of said determination."[4]  On remand following our ruling and clarification, the district court summarily denied RTC's renewed motion for sanctions and attorney's fees, stating only that its ruling was "[i]n accordance with the directions of the United States Court of Appeals for the Fifth Circuit."  The district court also denied the Estate's post-remand motion for sanctions against RTC and its counsel.

---

[2] Id. at 373.

[3] Id. at 371 n.2.

[4] Emphasis added.

3

In the instant appeal ("RTC II"), RTC contends that the district court misconstrued our RTC I decision and subsequent clarification as prohibiting the imposition of sanctions against the Dandars for the conduct that the district court had previously adjudged to be sanctionable. For its part, the Estate advances four challenges, viz., (1) the district court's refusal to award the Estate attorney's fees and costs under the contractual fee-shifting provision; (2) the denial of costs under 28 U.S.C. § 1919; (3) the denial of costs authorized under the Federal Rules of Appellate Procedure for the RTC I appeal; and (4) the district court's refusal to sanction RTC and its counsel under 28 U.S.C. § 1927, Federal Rule of Civil Procedure 11, and Florida law.

## II.  ANALYSIS

A.    STANDARD OF REVIEW

We review a district court's imposition or denial of sanctions for abuse of discretion.[5]  We review de novo a district court's interpretation of the terms of a contract, including the interpretation and application of a fee-shifting provision.[6]

B.    THE DISTRICT COURT'S RULINGS — BEFORE AND AFTER REMAND

---

[5] Mercury Air Group, Inc. v. Mansour, 237 F.3d 542, 548, 549 (5th Cir. 2001).

[6] See, e.g., L & A Contracting Co. v. So. Concrete Svcs., Inc. 17 F.3d 106, 109 (5th Cir. 1994).

4

Before RTC I vacated the judgment and award of damages to RTC, the district court, in ruling on RTC's motion for sanctions under § 1927, had expressed the following findings:

> The court finds that Plaintiff's request to have Defendant's attorneys sanctioned pursuant to 28 U.S.C. § 1927 is well taken in part. These proceedings were unnecessarily and vexatiously multiplied by arguments repeated over and over again by the defense after their merit was initially found lacking by the court early in the litigation. The court finds the conduct of Thomas and Kennan Dandar in filing these repeated, frivolous motions to be both unreasonable and vexatious. However, the Court also finds that Plaintiff's litigation posture in this case was overzealous and that Plaintiff advanced strident and specious arguments in its characteristic "overkill" mode of conducting this litigation. This action was also vexatious and unnecessarily complicated this case. Accordingly, the court orders that 30% of the attorney's fee award to be paid by Thomas and Kennan Dandar as a sanction for their unreasonable and vexatious conduct.

In essence, the district court originally concluded that, even though the Dandars had engaged in sanctionable litigation conduct on behalf of the Estate, counsel for RTC likewise employed tactics that unnecessarily multiplied the proceedings. Thus, as sanctions under § 1927, the court ordered the Dandars to pay personally a 30 percent share of the attorney's fees awarded under the fee-shifting provision in the underlying contract. But, as we subsequently vacated the underlying attorney's fee award in RTC I for lack of personal jurisdiction over the Estate, we effectively vacated the quantum of the § 1927 sanction award against the Dandars as well. We later clarified, however, that we were not reversing the imposition of sanctions vel non, only the quantum of the award

5

because of the methodology employed by the district court in
assessing a portion of the contractual attorney's fees against the
Dandars.

We are admittedly puzzled by the district court's ruling on
remand as to RTC's renewed motion for § 1927 sanctions.   We
speculate that the district judge either misconstrued our mandate[7]
or, frustrated by the contumacious conduct of both parties and
their respective counsel, threw up his hands and denied all of the
parties' post-remand motions in an effort to terminate this
unseemly litigation once and for all.   The district court was
certainly acting within its authority to reconsider whether § 1927
sanctions were justified in light of our decision in RTC I.[8]   Our
primary problem in dealing with that decision today, however, is
the court's failure to provide any explanation for denying RTC's
renewed motion for sanctions and attorney's fees.   "Although an
award of attorney's fees, like an award of costs, is committed to
the discretion of the trial court and can only be reversed for an

_____

[7] We are not sure what to make of the district court's
notation that its denial of RTC's renewed motion for sanction and
attorney's fees was "[i]n accordance with the directions of" this
Court.

[8] For example, it is conceivable that the district court
could have determined on remand that our decision in RTC I
significantly undermined the justification for § 1927 sanctions.
After all, we have explained that a finding of "unreasonable" and
"vexatious" multiplicative proceedings necessitates "evidence of
bad faith, improper motive, or reckless disregard of the duty
owed to the court."   Mercury Air Group, 237 F.3d at 549 (quoting
Edwards v. General Motors Corp., 153 F.3d 242, 246 (5th Cir.
1998)).

6

abuse of discretion, the trial court must give reasons for its decisions regarding attorney's fees; otherwise, we cannot exercise meaningful review."[9]

The district court's denial of RTC's renewed motion for sanctions without giving any explanation whatsoever is reversible error. Under normal circumstances, we would reverse and remand for more detailed findings and a fuller explanation of the district court's ruling. Tragically, though, the district judge who presided over this action passed away shortly after the parties filed their notices of appeal in RTC II. Thus, were we again to remand the sanctions issue to the district court, any judge who would draw the assignment would have no first-hand knowledge of the behavior at issue and, like us, would have to consider the motion afresh on the basis of the cold record. Given the history of this litigation, we have no doubt that a third panel of this court would then be required to confront yet another appeal (or cross-appeals) containing myriad assertions of error, regardless of the district court's ruling.

Under these circumstances, we are no less capable of engaging in such a record review than would be a newly assigned district judge. The peculiar posture of this case has led us to eschew another remand and instead to conduct our own independent review of

_____

[9] Schwarz v. Folloder, 767 F.2d 125, 133 (5th Cir. 1985) (citations omitted).  See also Copeland v. Wasserstein, Perella & Co., Inc., 278 F.3d 472, 484-85 (5th Cir. 2002).

7

the history of this action as reflected by the record on appeal.
Having done this as carefully as practicable, we are led to the
analysis and rulings that follow.

C.    RTC's APPEAL: § 1927 SANCTIONS AGAINST THE DANDARS

Section 1927 of the Judicial Code authorizes the imposition of
sanctions in the form of attorney's fees and costs against an
attorney who engages in improper litigation conduct:

> Any attorney or other person admitted to conduct cases in
> any court of the United States or any Territory thereof
> who so multiplies the proceedings in any case
> unreasonably and vexatiously may be required by the court
> to satisfy personally the excess costs, expenses, and
> attorneys' fees reasonably incurred because of such
> conduct.[10]

"Underlying the sanctions provided in 28 U.S.C. § 1927 is the
recognition that frivolous appeals and arguments waste scarce
judicial resources and increase legal fees charged to parties."[11]
The Supreme Court has observed that "§ 1927 does not distinguish
between winners and losers or between plaintiffs and defendants.
The statute is indifferent to the equities of a dispute and to the
values advanced by the substantive law."[12]  As explained by the
Fourth Circuit, the statute is designed to curb litigation abuses
by counsel, irrespective of the merits of the client's claim:

---

[10] 28 U.S.C. § 1927 (2000).

[11] Baulch v. Johns, 70 F.3d 813, 817 (5th Cir. 1995).

[12] Roadway Express, Inc. v. Piper, 447 U.S. 752, 762, 100 S.
Ct. 2455, 2462 (1980).  See also DeBauche v. Trani, 191 F.3d 499,
511 (4th Cir. 1999).

8

> [A]n attorney who files a meritorious claim and wins a
> substantial verdict may still be assessed sanctions under
> § 1927 if, during the case, he "multiplies the
> proceedings ... unreasonably and vexatiously." Likewise,
> an attorney who files a meritless claim may not be
> sanctioned under § 1927 if he does not engage in such
> conduct. Section 1927 focuses on the conduct of the
> litigation and not on its merits.[13]

We nevertheless remain mindful that § 1927 sanctions are "penal in nature, and in order not to dampen the legitimate zeal of an attorney in representing his client, § 1927 is strictly construed."[14]    Therefore, sanctions against the Dandars are justified <u>only</u> if their conduct was both "unreasonable" and "vexatious"; and even then, counsel may be ordered to pay personally only the "excess" costs, expenses, and attorney's fees generated by their conduct.

### 1.    The Dandars Filed Numerous Motions Containing Frivolous and Redundant Arguments

In its first order on the § 1927 issue, the district court found that "a significant portion of the number of hours spent by Plaintiff's counsel on this simple breach of contract case was due to the repeated, frivolous arguments made by [the Dandars] in needless and pointless motions."    The record supports this conclusion: The Estate, through pleadings signed by the Dandars, repeatedly filed motions that reiterated many of the same assertions and arguments.    The record makes clear that the Estate

---

[13] <u>DeBauche</u>, 191 F.3d at 511.

[14] <u>Travelers Ins. Co. v. St. Jude Hosp.</u>, 38 F.3d 1414, 1416 (5th Cir. 1994) (citations omitted).

9

frequently rehashed previously-rejected arguments, and that the court issued several cautionary rebukes before imposing sanctions. For example, in ruling against the Estate on one motion, the district court remarked, "Defendant reargues several issues of law on which the Court has previously ruled and provides no authority which requires a revisit of those issues." The Dandars took no heed. In another instance, the district court stated that "[t]he Court has addressed Defendant's arguments in its previous rulings. Defendant presents no new arguments or newly discovered evidence showing the need to correct manifest errors of law or fact."

It is expected and required that an attorney preserve error and represent his client vigorously. And it is certainly true that courts sometimes make legal and factual mistakes, which is what the appellate process corrects, as illustrated in RTC I by our reversal of the district court on the issue of personal jurisdiction. But attorneys do a disservice to their clients as well as to the court and the judicial system when they repeatedly file essentially identical motions that do little more than waste their opponent's and the courts' time and resources. Such tactics overburden the courts and frustrate the administration of justice; they simply will not be tolerated.

We can never know precisely what motivated the Dandars to pursue such contumacious tactics.[15]   In any event, the Dandars'

---

[15] Perhaps the Dandars believed that their motion practice was the only way to confront RTC, an affiliate of the Church of

10

continued engagement in improper motion practice after repeated warnings by the district court was "reckless disregard" of the duty they owed to the court.[16]    Such conduct is unreasonable and vexatious beyond cavil, and therefore warrants § 1927 sanctions.

### 2.    The Proper Amount of the Sanctions

In determining the appropriate quantum of sanctions against the Dandars, the district court made the important observation that RTC itself was not blameless in this respect.    The court also concluded that the three law firms representing RTC billed hours that were excessive:

> There was no need to have three law firms duplicating work on a simple case wherein the court found the liability issue on summary judgment for [RTC] before trial.  Numerous, overly zealous arguments were advanced by [RTC] in needlessly voluminous fashion in response to weak, frivolous, and brief motions of [the Estate].  Also it appears there was much billing for conferences between attorneys at different firms, rereading of pleadings by three different sets of lawyers, and some needless duplication.

Our review of the record confirms the accuracy of this finding.

Because of the district judge's ensuing death, we are at a disadvantage in setting the amount of the sanction with the precision that could have been accorded by the judge who observed the sanctionable conduct of the Dandars first-hand.

---

Scientology, which has acquired a "reputation for extremely aggressive litigation tactics."  J.P. Kumar, "Fair Game": Leveling the Playing Field in Scientology Litigation, 16 REV. LITIG. 747, 747-48 (1997).  It goes without saying, though, that this is no excuse for counsel's behavior.

[16] Mercury Air Group, 237 F.3d at 549.

> The principal fact issue in § 1927 cases—the state of
> mind of the offender—may perhaps best be described as a
> mixed question of law and fact. It is one which "is
> informed by the district court's intimate familiarity
> with the case, parties, and counsel, a familiarity [that
> an appellate court] cannot have. Such a determination
> deserves substantial deference from a reviewing court."[17]

Nevertheless, we have audited RTC's counsel's billing records
and supporting documentation, which comprise nearly 500 pages in
the record on appeal, and we conclude that the Dandars should be
ordered personally to pay $27,304.50, being one-twelfth (or 8.33%)
of RTC's total amount of attorney's fees that the district court
had determined to be reasonable.[18]

Our admittedly-imprecise sanction is grounded in our estimate
that at least one-sixth of the hours expended by RTC's lawyers was
the "excess" product of sanctionable conduct by the Dandars. Under
the facts of this case, though, we cut this amount in half for two
reasons. First and most importantly, we must account for RTC's own
blameworthiness in multiplying the proceedings here. Second,
although RTC's legal basis for suing in Texas — the Estate's
representative residing there — was not a legal position taken in
bad faith,[19] RTC's tactical decision to file this suit in Texas made
little practical sense. Because Florida was geographically the

---

[17] Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.,
210 F.3d 1112, 1119 n.12 (9th Cir. 2000) (quoting O'Connell v.
Champion Int'l Corp., 812 F.2d 393, 395 (8th Cir. 1987)).

[18] We agree with the district court's calculation of
$327,654 as a reasonable lodestar.

[19] See RTC I, 339 F.3d at 374-76.

true locus of this dispute, RTC appreciably increased both parties'
costs of litigation and wasted judicial resources by suing in
Texas.  Thus, we do not penalize RTC for advancing that which, in
RTC I, proved to be a losing theory of personal jurisdiction.  We
decline, though, to reimburse attorney's fees that RTC would not
have incurred if its counsel had filed suit in Florida, the most
logical and convenient forum and one with obvious jurisdiction.

In sum, even though in RTC I the Estate might have ultimately
prevailed, we still cannot condone and reward the Dandars' grossly
excessive multiplication of the district court proceedings.  Our
sanction reflects what is probably a conservative estimate of the
net "excess" attorney's fees generated by the Dandars' conduct.[20]

D.   THE ESTATE'S CROSS-APPEAL

For its part, the Estate advances four issues on appeal.  None
has merit.

### 1.   Attorney's Fees and Costs under the Contractual Fee-Shifting Provision

The only non-frivolous point advanced by the Estate on appeal
is its contention that the district court erroneously denied its
motion for attorney's fees and costs under the fee-shifting term of

---

[20] Although we sit in the shoes of a district court as we
render our decision today, under the circumstances, we simply
cannot bring to this case the perspective of a district judge who
presides over a case from start to finish.  For that reason, we
have not designated this opinion for publication, and we caution
district courts from relying on this decision's methodology in
the future for the imposition of § 1927 sanctions.

13

the contract that underlies this litigation. This provision states that, "[i]n the event of a breach of this agreement, the prevailing party shall be entitled to attorneys' fees and costs." The contract also provides that it "shall be construed in accordance with Florida law."

The Estate contends that our ruling in RTC I, concluding that personal jurisdiction over the Estate was wanting, renders the Estate the "prevailing party" and thus entitles it to attorney's fees and costs under the contract. The Estate relies on state court decisions from Florida which hold generally that if attorney's fees are provided for by statute or by the parties' contract, such fees are properly awarded after a voluntary dismissal of the case.[21] These cases cannot carry the day for the Estate for the obvious reason that RTC did not voluntarily dismiss the case: Our judgment in RTC I did that.

The Estate is not entitled to an award of attorney's fees for a more rudimentary reason: The plain language of the contract's fee-shifting provision limits the award of attorney's fees and costs to breaches of that agreement. Under Florida law, agreements

---

[21] Thornber v. City of Fort Walton Beach, 568 So. 2d 914, 919 (Fla. 1990); Landry v. Countrywide Home Loans, Inc., 731 So. 2d 137, 139 (Fla. Dist. Ct. App. 1999); Prescott v. Anthony, 803 So. 2d 835, 836-37 (Fla. Dist. Ct. App. 2001); Ajax Paving Indus., Inc. v. Hardaway Co., 824 So. 2d 1026, 1029 (Fla. Dist. Ct. App. 2002).

14

providing for the award of attorney's fees are strictly construed.[22]
Before there can be an award of attorney's fees and costs, there
must be a determination that the contract was breached.  After RTC
I's vacature, no such determination exists.  For this reason, the
Estate is foreclosed from seeking attorney's fees and costs under
the contract.

   2.   Costs under 28 U.S.C. § 1919

   The Estate next asserts that it was improperly denied costs
under 28 U.S.C. § 1919.[23]  Section 1919 permits district courts to
order the payment of "just costs" when an action or suit is
dismissed for want of jurisdiction.  There is nothing in § 1919,
however, that requires such an award: Orders under this statute are
purely permissive.[24]   In light of the conduct of the Estate's

_____

   [22] See Rivera v. Deauville Hotel, Employers Svc. Corp., 277
So. 2d 265, 266 (Fla. 1973); Ohio Realty Inv. Corp. v. So. Bank
of West Palm Beach, 300 So. 2d 679, 682-83 (Fla. 1974); Venetian
Cove Club, Inc. v. Venetian Bay Developers, Inc., 411 So. 2d
1323, 1324 (Fla. Dist. Ct. App. 1982).  See also Sholkoff v. Boca
Raton Cmty. Hosp., Inc., 693 So. 2d 1114, 1117-18 (Fla. Dist. Ct.
App. 1997) (explaining that "perhaps it is more accurate to say
that the rule is that if an agreement for one party to pay
another party's attorney's fees is to be enforced it must
unambiguously state that intention and clearly identify the
matter in which the attorney's fees are recoverable").

   [23] 28 U.S.C. § 1919 (2000) ("Whenever any action or suit is
dismissed in any district court, the Court of International
Trade, or the Court of Federal Claims for want of jurisdiction,
such court may order the payment of just costs.").

   [24] Miles v. California, 320 F.3d 986, 988 n.2 (9th Cir.
2003).  This follows from the plain text of the statute, which
states that a court "may order the payment of just costs." 28
U.S.C. § 1919 (emphasis added).

15

counsel described above, we cannot conclude that the district court abused its discretion in denying the Estate costs under § 1919.

### 3. The Estate's Appellate Costs from RTC I

As part of our mandate in RTC I, we ordered that "the costs on appeal are to be taxed against" RTC.[25] The Estate, however, failed timely to file its bill of costs as required by Federal Rule of Appellate Procedure 39(d)(1). As a result, the district court on remand denied the Estate its costs incurred in RTC I, a decision the Estate now appeals. The Estate's attempt on appeal to lay the blame for its own failings at the doorstep of the district court is pure sophistry.[26] The district court committed no reversible error in denying appellate costs to the Estate.

### 4. The Estate's Motion for Sanctions

Lastly, the Estate contends that the district court should have sanctioned RTC and its counsel under Federal Rule of Civil Procedure 11, § 1927, and a Florida frivolous litigation statute.[27] The essence of the Estate's argument is that RTC I demonstrated

[25] See FED. R. APP. P. 39.

[26] On appeal, the Estate failed even to mention that its costs were denied for failure to file its bill of costs on time. We disapprove of this lack of candor with the Court. See United States v. City of Jackson, 359 F.3d 727, 732 n.9 (5th Cir. 2004) (reminding counsel that they are expected to bring directly before the Court all those conditions and circumstances relevant to a given case).

[27] See FLA. STAT. ANN. § 57.105 (West 2004). See generally Visoly v. Security Pac. Credit Corp., 768 So. 2d 482, 490-91 (Fla. Dist. Ct. App. 2000) (construing § 57.105).

16

conclusively that RTC's breach of contract claim was baseless.   As
such, argues the Estate, RTC and its counsel should be sanctioned
and required to pay the Estate's attorney's fees and costs.

We recognize that the district court failure to provide any
explanation for its denial of the Estate's post-remand motion for
sanctions was an abuse of discretion.[28]   We need not, however,
belabor consideration of the merits of that motion here.   Just
because the Estate prevailed on appeal on jurisdictional grounds
does not mean that RTC's conduct in bringing the claim was
sanctionable under Rule 11 or otherwise.[29]   Lack of personal
jurisdiction is not synonymous with lack of a substantive basis for
a claim.   We have already acknowledged that RTC (and its counsel)
do not have clean hands; they, too, improperly multiplied the
proceedings.   As we have explained, though, the sanctions imposed
against the Dandars has been reduced concomitantly to the extent
that we have judged RTC to have engaged in conduct which
unnecessarily multiplied the proceedings.   The district court's

---

[28] See supra note 9 and accompanying text.

[29] The Estate's reliance on Fla. Stat. § 57.105 is feckless.
"Because section 57.105 is patterned after Federal Rule 11,"
Florida courts "construe it as its prototype has been construed
in federal courts, insofar as such construction is harmonious
with the spirit and policy of Florida legislation on the
subject." Mullins v. Kennelly, 847 So. 2d 1151, 1154 (Fla. Dist.
Ct. App. 2003).   In this case, § 57.105 sanctions would be
inappropriate for the same reasons that Rule 11 sanctions are
unwarranted.

17

denial of the Estate's post-remand motion for sanctions is affirmed.

### III.  CONCLUSION

By failing to articulate the reasons for its ruling, the district court abused its discretion when it denied RTC's renewed motion for sanctions and attorney's fees following our remand in RTC I.  Under the unusual posture of this case, though, we decline to remand this case only to have it assigned to another district judge who, like us, would be compelled to examine a cold record from scratch so as to calculate the proper quantum of sanctions. Instead, we have conducted our own thorough examination of the district court record and of the parties' contentions on appeal. Based on this review, we reverse the district court's ruling and render an award of $27,304.50 in favor of RTC as a sanction of the Dandars for their unreasonable and vexatious litigation conduct in derogation of 28 U.S.C. § 1927.[30]  All other rulings of the district court are affirmed.

AFFIRMED in part; REVERSED in part; and RENDERED.

---

[30] This sanction is assessed against Thomas Dandar, Kennan Dandar, and their law firm of Dandar & Dandar, P.A., jointly and severally.

18